**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KERI JEAN COOK , et al.,** | : | **Case No. 2:11-CV-00691** |
| | : | |
| **Plaintiffs,** | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | **Magistrate Judge Norah M. King** |
| | : | |
| **CARESTAR, INC., et al.,** | : | |
| **Defendants.** | : | |
| | : | |

## <u>OPINION & ORDER</u>

This matter is before the Court on the Motion of Plaintiffs Keri Jean Cook, et al.

("Plaintiffs") for Partial Summary Judgment, (Doc. 33), and the Motion of Defendants Carestar,

Inc. and Thomas R. Gruber (collectively "Defendants") for Summary Judgment, (Doc. 34). For

the reasons set forth herein, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part and

Defendant's Motion is **DENIED**.

## I. BACKGROUND

### *A. Factual Background*

Plaintiffs bring this action for unpaid overtime and related relief under the Fair Labor

Standards Act ("FLSA" or "the Act"), 29 U.S.C. § 216(b), and Ohio Revised Code §§ 4111.03

and 4111.10., on behalf of themselves and a class of current and former Case Managers

employed by Defendant Carestar, Inc. ("Carestar" or the "Company").  (*Amend. Compl.*, Doc. 3.)

Carestar provides services to assist chronically disabled individuals to stay in the community and

out of nursing homes. Defendant Thomas Gruber ("Gruber") is co-founder and President of

Carestar, owns 11% of the Company, and has extensive control over a number of significant aspects of Carestar's operations.[1] (*Gruber Dep*., Doc. 29, 8:23-9:13, 37:6-8.)

The Ohio Department of Job and Family Services ("ODJFS"), which supervises Ohio's Medicaid Program, has contracted Carestar to be ODJFS's Case Management Agency ("CMA") for the Home and Community Based Services Waiver Program (the "HCBS Waiver Program").[2] As ODJFS's designated CMA, Carestar performs case management and care coordination functions throughout Ohio for Medicaid recipients ("consumers") enrolled in the HCBS Waiver Program. (*Moscardino Aff.*, Doc. 34-1, ¶¶ 2, 4, 10.)

Plaintiffs in this case were employed by Carestar as case managers, whose duties included "development and implementation of medical care plans and evaluations of the appropriateness, quality and cost effectiveness of Medicaid and other community services provided to persons with chronic illnesses or disabilities." (*See Amend. Compl*., Doc. 3, ¶¶ 5, 7, 9 and 11.)  Carestar has classified its case managers as exempt from the compensation and overtime protections of the Fair Labor Standards Act ("FLSA").

### 1. Case Manager Qualifications and Job Duties

Carestar's Case Manager job description describes the duties and responsibilities that position as follows:

> The Case Manager is responsible for on-going case management services to the consumer, including service coordination, education and referral; authorization of services/changes; advocacy, assisting the consumer and team members with problem-solving; the ongoing monitoring of consumer outcomes, health, safety, eligibility and costs.

---

[1] President Gruber "has overall authority and responsibility to direct the activities of the organization" (*Gruber Dep*., Doc. 29, 14:18-15:4), and all of his subordinates represent his authority in their areas of responsibility. (*Id*. at 15:5-20). No one at Carestar "has more influence than [President Gruber] in setting compensation levels for jobs." (*Id*. at 29:10-15). No one at Carestar "has more control over CareStar's financial affairs" than President Gruber. (*Id*. at 29:20-30:18). "When it comes to establishing CareStar's budgets and financial targets," no one "has more control than [President Gruber]." (*Id*. at 33:13-18).

[2] The Home and Community Based Services Waiver Program makes services available to the Medicaid recipients so that they may remain at their homes rather than be placed in an institutional setting, such as a nursing facility.

(*Job Description*, Doc. 29-6.) Carestar's definitions of "case management" further describe the role of its case managers as being: (1) a liaison to those who can provide medical services (e.g. persons practicing as nurses) or social services (e.g., persons actually practicing as social workers); and (2) a gate-keeper, to screen out consumers who are not eligible for government-funded services.[3]

Defendants assert that, in addition, case managers must evaluate the appropriateness of medical and community services, the quality and effectiveness of these services, and determine whether the services are being delivered to the consumers in accordance with their "All Service Plans." (*See Weed Aff.*, Doc. 34-6, ¶ 10; *see also Farrell Aff.*, Doc. 34-2, ¶ 13.)[4] Cases managed by Carestar case managers can range from a newborn on a respirator, to a child with autism, to persons using wheelchairs, to the elderly suffering from dementia. (*Farrell Aff.*, Doc. 34-2, ¶¶ 16-18.)

Federal Medicaid regulations require that ODJFS assure that all providers under this program meet the state licensure and certification requirements. (*Moscardino Aff.*, Doc. 34-1. ¶

---

[3] Carestar's definitions of "case management," are as follows:

> Case Management Definition: An activity which assists consumers in gaining access to other Medicaid state plan or community services, as well as the needed medical, social, educational and other appropriate services; regardless of the funding source.

> Case Management Definition #2: Monitoring the delivery of all services identified in the ASP [All Services Plan]; periodic evaluation of the consumer's goals, objectives, and outcomes for ODJFS [Ohio Department of Job and Family Services] HCBS [Home and Community Based Services] Waiver; periodic redetermination of program eligibility; authorization of allowable changes in amount, scope and duration of services, and assisting the consumer to access needed waiver and other medical and social services regardless of funding source.

(*Carestar Powerpoint*, Doc. 29-7, 1-2.)
[4] Defendant's description of the responsibilities of a case manager also seeks to cast the role as more care-oriented. (*See Farrell Aff.*, Doc. 34-2, ¶ 7) (describing the case manager position as including "screening of referrals, intake, assessment, care coordination and individualized care planning, program eligibility determination, ongoing monitoring of the appropriateness of services and the health and safety of the consumer, consumer and caregiver education and support, and managing cost caps assigned to each individual to assure program cost neutrality").

6.) In accordance with that mandate, the Ohio Administrative Code, 5101:3-45-01(K), defines a Case Manager" as a "registered nurse (RN), licensed social worker (LSW) or licensed independent social worker (LISW) employed by the CMA who provides case management services to consumers enrolled on an ODJFS – administered waiver." (*Moscardino Aff.*, Doc. 34-1, ¶ 11.) The Ohio Administrative Code imposes various educational requirements to obtain these licenses. (*See Farrell Aff.*, Doc. 34-2, ¶¶ 10 – 12) (detailing educational requirements for RN, LSW, and LISW licenses).

Carestar's Case Manager job description likewise requires that case managers be licensed in either nursing or social work.  Carestar's job description does not, however, require any specific level of academic achievement in any specific discipline. (*Job Description*, Doc. 29-6.) In addition, licensed nurses employed as case managers are prohibited from providing actual hands-on nursing care. (*Gruber Dep.*, Doc. 29, 116:11-15.)

Plaintiffs argue that the knowledge required to perform their jobs comes primarily from Carestar training and on-the-job experience. Specifically, Plaintiffs present evidence that their actions are dictated entirely by processes set forth in Carestar's Case Management Practice Guidelines, Occurrence Reporting Form Manual, and other Carestar materials, and that there is a Carestar case management script for every situation. (*See Case Mgmt. Practice Guidelines*, Doc. 29-11; *All Service Plan ("ASP") Instructions*, Doc. 29-12; *Supp. Cook Aff.*, Doc. 35-5.) It is undisputed that, upon hiring, Carestar requires that its case managers attend a three-week orientation program. (*Weed Aff.*, Doc. 34-6, ¶ 19.) As part of the orientation training process, case managers are trained in Carestar's electronic recording system, as well as in how to use the various tools that Carestar uses to assess the acuity and needs of its consumers. (*Id.* at ¶ 20; *see Gruber Dep.*, Doc. 29, 100:4-18; *Case Mgmt. Practice Guidelines*, Doc. 29-11; *ASP Instructions*,

Doc. 29-12.) In addition, Carestar utilizes periodic "Education Days" to disseminate specific information about Carestar and the Ohio Home Care Program. Defendants assert that Carestar's training is not a substitute for specialized RN, LSW, or LISW knowledge, which Carestar contends is necessary for case managers to perform their primary duties. (*Weed Aff.*, Doc. 34-6, ¶ 15, 21.)

2. Case Manager Compensation

The facts of Carestar's compensation system for case managers are not in dispute. Each case manager is assigned a number of consumers or cases that he or she is responsible for managing. Each case is assigned one of three acuity levels depending upon the "needs/situation" of that particular case. The acuity levels have an associated point value ranging from 1.66 to 2.00 to 3.33. A case manager's total caseload is determined by totaling the point value of his or her assigned cases.

Upon hiring, a case manager is given a dollar value for each point in his or her caseload. This amount is determined based upon the individual case manager's educational level, credentials (i.e., RN/LSW/LISW) and experience. The Case Manager's compensation per pay period is determined by adding up the total number of points in his or her caseload and multiplying that by the dollar value of the points. (*See Case Manager Compensation Review*, Doc. 34-7.)

The compensation system pays case managers an amount for each case managed, regardless of the time expended in performing such management duties. As Plaintiffs point out, Carestar's compensation system guidelines nowhere discuss the amount of time expected to be worked by case managers in performing their duties.

<u>3. Carestar's Actions Related to Case Manager Classification</u>

Defendants assert that, in classifying its case managers as exempt, Carestar relied in good faith on a letter from its attorney.  In 2006, Gruber and Carestar's Human Resources Manager attended a seminar in 2006 where the topics discussed included exemptions under the FLSA. Following this seminar, Gruber contacted an attorney to inquire specifically about the classification of its Case Managers especially in light of their points-based compensation system. Specifically, Gruber engaged attorney Mark D. Katz, a former U. S. Department Of Labor attorney, who had prosecuted employers for violations of the Fair Labor Standards Act, for an opinion. Gruber provided an oral description of the case managers' duties, including the requirement that the case managers have valid licenses as either a Registered Nurse, Licensed Social Worker, or Licensed Independent Social Worker, and the description of the points-based compensation system. Katz was not given, nor did he review, any pertinent documents. Plaintiffs highlight Gruber's deposition testimony indicating that he is not personally knowledgeable about case managers' job duties.

Based on Gruber's oral representations alone, on November 15, 2006, Katz issued an opinion letter, which concluded that Carestar case managers were "Learned Professionals" exempt from the requirements specified in 29 C.F.R. § 541.301. Katz also concluded that the points-based compensation system was a "fee basis" of payment as defined in 29 C.F.R. 541.605. Katz advised that, "In the future, I would suggest on a quarterly basis that the company performs an audit wherein a designated number of Case Managers and a designated number of workweeks are 'tested' in order to determine compliance with the requirements set forth above." This audit appears to have been aimed at assuring that Case Managers continued to receive the

6

minimum weekly rate necessary to qualify as a fee under 29 C.F.R. 541.605.  Plaintiffs assert that Carestar did not adquately follow up on Katz's recommendations.

*B. Procedural History*

On August 2, 2011, Plaintiffs filed this collective action against Defendants Carestar and Gruber, for unpaid wages and overtime in violation of the Fair Labor Standards Act, 29 U.S.C. § 216(b),  and Ohio Revised Code §§ 4111.03 and 4111.10.  (*Compl.*, Doc. 1; *Amend. Compl.* Doc. 3.)  On January 12, 2012, Plaintiffs moved for class certification pursuant to 29 U.S.C. § 216(b). (Doc. 8.)  On March 5, 2012, this Court entered an agreed order certifying this case as a collective action and permitting supervised notice to potential opt-in plaintiffs.  (Doc. 9.)

On November 21, 2012, Plaintiffs filed a Motion for Partial Summary Judgment, (Doc. 33), and Defendants filed a Motion for Summary Judgment, (Doc. 34).  Plaintiffs move this Court to find that there exists no genuine issue of material fact and that Plaintiffs are entitled to judgment as a matter of law that: (1) Plaintiffs are entitled to overtime compensation because they are not exempt "Learned Professionals;" (2) Carestar and its President, Thomas J. Gruber, are liable as "employers" under the FLSA; (3) Plaintiffs' overtime should be calculated at one and one-half times their regular rate, which is their weekly earnings divided by their regularly scheduled 40-hour workweek; and (4) Plaintiffs are entitled to an amount  equal to their overtime compensation in liquidated damages.  Defendants oppose all elements of the motion.  Defendants move this Court to find that there exists no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law that:  (1) Plaintiffs are "Learned Professionals" exempt from FLSA overtime requirements; (2) in the event Plaintiffs are non-exempt, Defendants' violation was not "willful"; and (3) in the event Plaintiffs are non-exempt, liquidated damages should not be awarded.  These matters have now been fully briefed.  Oral argument on the

parties' cross-motions for summary judgment was held on August 19, 2013.  These matters are therefore ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if proof of that fact would establish one of the elements of a claim and would affect the application of governing law to the rights of the parties.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis, Wyo.*, 542 P.2d 867, 872 (1975)).

A movant for summary judgment meets its initial burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Dixon v. Anderson*, 928 F.2d 212, 216 n. 5 (6th Cir.1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986)).  "At that point, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). It is not, however, the role of the trial court to "resolve factual disputes by weighing conflicting evidence because it is the jury's role to assess the probative value of the evidence." *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 230 (6th Cir. 1990) (citing *Stone v. William Beaumont Hosp.,* 782 F.2d 609, 615 n. 5 (6th Cir. 1986); *Kennett-Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980)).  "All evidence and reasonable inferences 'must be viewed in the light most favorable to the party opposing the motion.'" *Pucci*, 628 F.3d at 759 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. LAW AND ANALYSIS

The Fair Labor Standards Act ("FLSA") "generally requires covered employers to pay minimum wages and overtime compensation for hours of work exceeding 40 in a workweek at a rate of one and one-half times an employee's regular rate of pay." *Lewis v. Huntington Nat'l Bank*, 838 F.Supp.2d 703 (S.D. Ohio 2012) (citing 29 U.S.C. §§ 206(a), 207(a)(1)).  Exempt from the minimum wage and overtime compensation provisions of the FLSA, however, are any employees who are employed in a "bona fide … professional capacity." 29 U.S.C. § 213(a)(1). Any employees who qualify as professionally exempt, therefore, are not entitled to overtime compensation under the FLSA.

Ohio's Minimum Fair Wage Standards Act sets forth the same general requirement, subject to the exemptions set forth in the FLSA:

> An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek, in the manner and methods provided in and subject to the exemptions of section 7 and section 13 of the "Fair Labor Standards Act of 1938," ... 29 U.S.C.A. 207, 213, as amended.

Ohio Rev. Code § 4111.03(A); *see Viciedo v. New Horizons Computer Learning Ctr. of Columbus, Ltd.*, 246 F. Supp. 2d 886, 900 (S.D. Ohio 2003). As the Sixth Circuit has explained, "[t]he employer has the burden of proving that an employee satisfies any exemptions under the FLSA, and exemptions under the FLSA are narrowly construed against the employer." *Elwell v. University Hospitals Home Care Services*, 276 F.3d 832, 837 (6th Cir. 2002).

### A. Whether Plaintiffs Are Exempt as "Learned Professionals"

Defendants assert that Plaintiffs qualify for the "learned professional" exemption from the FLSA's overtime payment requirements.  Department of Labor ("DOL") regulation

construing and enforcing the FLSA refine the term "employee employed in a bona fide professional capacity" to mean any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week … exclusive of board, lodging, or other facilities; and
>
> (2) Whose primary duty is the performance of work:
>
> (i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or
>
> (ii) Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.

29 C.F.R. § 541.300.

### 1. Whether Plaintiffs are Compensated on a "Fee Basis"

To qualify for the "learned professional" exemption, Plaintiffs must first be "[c]ompensated *on a salary or fee basis* at a rate of not less than $455 per week…." 29 C.F.R. § 541.300(a)(1) (emphasis added).[5] Defendants concede that Case Managers are not compensated on a "salary basis," but rather assert that they are compensated on a "fee basis." The DOL regulation on "fee basis" compensation, explains:

> An employee will be considered to be paid on a "fee basis" within the meaning of these regulations if the employee is paid an agreed sum for a single job regardless of the time required for its completion. These payments resemble piecework payments with the important distinction that generally a "fee" is paid for the kind of job that is unique rather than for a series of jobs repeated an indefinite number of times and for which payment on an identical basis is made over and over again. Payments based on the number of hours or days worked and not on the accomplishment of a given single task are not considered payments on a fee basis.

29 C.F.R. 541.605(a).

---

[5] None of the Plaintiffs claim that their compensation was less than $455.00 per week. Based upon the dollar value of Plaintiffs' points, weekly compensation of less than $455.00 could only occur with a very small case load which is not at issue in this case.

Defendants rely on *Fazekas v. Cleveland Clinic Foundation Health Care Ventures, Inc*., 204 F.3d 673 (6th Cir. 2000), to argue that Carestar case managers are compensated on a "fee basis."  In *Fazekas*, the Sixth Circuit considered whether certain home health nurses were paid on a fee basis for the purposes of the FLSA's "professional" exemption.  *See id.* at 675-79. The *Fazekas* plaintiffs were compensated on a per-visit basis, regardless of the time spent on each home health visit. Although the nurses performed multiple tasks within a single visit, including case management and care coordination tasks, and even expended some time outside consumers' homes on "attendant transportation and administrative duties," all such tasks were "connected with the actual visits themselves." *Id*. at 675. Thus, while the nurses often provided ongoing treatments and implemented ongoing care plans over the course of multiple visits, such services were divisible in to discrete components (i.e., the individual visit), and compensated as such. Accordingly, the disputed matter in *Fazekas* was *not* whether the nurses were compensated for performing a "single job," but rather whether each job was "unique" and, therefore, unlike "piecework payments." *Id*. at 676.  Analogizing a home health nurse to "a singer, who may, after all, perform the same song or set of songs over and over again during a series of performances, or … an illustrator, who may similarly repeat the same drawings or set of drawings as necessary," *id*. at 679, the Court determined that each home health visit was indeed unique. Because this was consistent with the controlling DOL opinion on the matter, *see id*. at 676-678, the Court concluded that home health nurses paid on a per-visit basis were professionals compensated on a fee basis and therefore FLSA-exempt.

Here, in contrast, throughout a two-week pay period, case managers perform multiple individual tasks in connection with a particular consumer, which cannot be linked back to a single discrete job like a visit, a performance, or a project. Indeed, the pay-period does not

correlate with a discrete set of tasks or goals. (*Case Mgmt. Practice Guidelines*, Doc. 29-11, 2-4; *Bowman Aff.*, Doc. 33-1 , ¶ 5 ("The points system used to compensate me was not based on my completion of any single task. Rather, this compensation system required I provide consumers with a series of services which were repeated an indefinite number of times per year based on the consumer's particular needs."); *Cook Aff.*, Doc. 33-2, ¶ 5 (same); *Gildow Aff.* Doc. 33-3 , ¶ 5(same); *Kurtz Aff.*, Doc. 33-4, ¶ 5(same); *Potelicki Aff.*, Doc. 33-5, ¶ 5(same); *Steele Aff.*, Doc. 33-6, ¶ 5(same)). Rather, Carestar's Case Management Practice Guidelines identifies numerous ongoing duties, such as periodic reevaluations and a number of required contacts with the consumer during the first and subsequent six month periods. (*Case Mgmt. Practice Guidelines*, Doc. 29-11; *see also Job Description*, Doc. 29-5 ("The Case Manager is responsible for on-going case management services to the consumer, including … the on-going monitoring of consumer outcomes, health, safety, eligibility and costs.")).[6] Thus, unlike a nurse's home health visits, a singer's performances, or an illustrator's drawings, the on-going work done by case managers in connection with a case cannot be reduced a series of two-week-long "single job[s]." Therefore, the only basis for delineating and distinguishing case managers' unit of compensation is the duration of the pay period.  As DOL regulations make plain, however, "[p]ayments based on the number of hours or days worked and not on the accomplishment of a given single task are not considered payments on a fee basis." 29 C.F.R. § 541.605(a).  Carestar's case manager

---

[6] Carestar's President confirmed the ongoing nature of a Case Manager's duties as follows:
>     A. Case management is I would call it a circular process or a continuing process….
>     Q. All right. And that just keeps going and going, as long as they're in the program?
>     A. Yes.
(*Gruber Dep.*, Doc. 29, 87:21-88:7.)
In addition, Carestar's former Director of Program Manager stated:
>     Q. Would you agree that a case manager performs these basic fundamentals of the job over and over again for a customer as long as they have them…?
>     A. Yes. I mean I think as long as a consumer is assigned to a case manager, they're constantly assessing and adjusting the service plan and linking to other services and the things that are mentioned [in Carestar's Case Management Manual].
(*Shrider Dep.*, Doc. 30, 29:10-19.)

compensation system thus fails to meet the DOL's definition of a "fee basis" of payment as a matter of law.

Because Case Managers are not compensated on a "salary or fee" basis, they cannot satisfy the requirements for a "professional" exemption under the FLSA. *See* 29 C.F.R. § 541.300(a)(1). Accordingly, this alone is sufficient to grant Plaintiffs' Motion for Partial Summary Judgment with respect to Carestar's misclassification of its Case Managers as "exempt" employees.

## 2. Plaintiffs' Primary Duties

To qualify for a "learned professional" exemption under 29 U.S.C. § 213(a)(1), DOL regulations also require that an employee's "primary duty [be] the performance of work … (i) [r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300(a)(2)(i).[7] Thus even if, *arguendo*, Plaintiffs were compensated on a fee basis, they are not be exempt as "learned professionals" unless Defendants can also make the above showing as to case managers' "primary duty."

According to Department of Labor regulations, this "primary duty" test includes three elements:

(1) The employee must perform work requiring advanced knowledge;

---

[7] FLSA regulations define "primary duty" to mean:

> the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a).

(2) The advanced knowledge must be in a field of science or learning;[8] and
(3) The advanced knowledge must be customarily acquired by a prolonged course
of specialized intellectual instruction.[9]

29 C.F.R. § 541.301(a).

Plaintiffs argue that, because Carestar's licensure requirement does not require a specific

level of academic achievement (e.g., associate's degree, bachelor's degree, etc.) in a specific

discipline, case management cannot not require "advanced knowledge … acquired by a

prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a)(3). To support

this premise, Plaintiffs rely on *White v. Murtis M. Taylor Multi-Service Center*, 188 Ohio App.3d

409 (Ohio App. 8th Dist. 2010), a case in which the court considered a social job description that

did not require any specific academic degree. *White* found that the lack of such a requirement

---

[8] FLSA regulations define "field of science or learning" as follows:

> The phrase "field of science or learning" includes the traditional professions of law, medicine,
> theology, accounting, actuarial computation, engineering, architecture, teaching, various types of
> physical, chemical and biological sciences, pharmacy and other similar occupations that have a
> recognized professional status as distinguished from the mechanical arts or skilled trades where in
> some instances the knowledge is of a fairly advanced type, but is not in a field of science or
> learning.

29 C.F.R. § 541.301(c).

[9] FLSA regulations define "customarily acquired by a prolonged course of specialized intellectual instruction" as
follows:

> (d) The phrase "customarily acquired by a prolonged course of specialized intellectual instruction"
> restricts the exemption to professions where specialized academic training is a standard
> prerequisite for entrance into the profession. The best prima facie evidence that an employee
> meets this requirement is possession of the appropriate academic degree. However, the word
> "customarily" means that the exemption is also available to employees in such professions who
> have substantially the same knowledge level and perform substantially the same work as the
> degreed employees, but who attained the advanced knowledge through a combination of work
> experience and intellectual instruction. Thus, for example, the learned professional exemption is
> available to the occasional lawyer who has not gone to law school, or the occasional chemist who
> is not the possessor of a degree in chemistry. However, the learned professional exemption is not
> available for occupations that customarily may be performed with only the general knowledge
> acquired by an academic degree in any field, with knowledge acquired through an apprenticeship,
> or with training in the performance of routine mental, manual, mechanical or physical processes.
> The learned professional exemption also does not apply to occupations in which most employees
> have acquired their skill by experience rather than by advanced specialized intellectual instruction.

29 C.F.R. § 541.301(d).

indicated that the position did not "require" advanced knowledge, explaining: "The job description assumes that individuals of various educational and work backgrounds could serve in the C[ommunity] S[upport] S[pecialist] 1 position. Such a vague description does not merit the type of specialized knowledge required of a learned professional." *Id*. at 419.  The facts of *White*, however, indicate that the job description required merely "[s]ome coursework in social work, counseling, psychology, or related disciplines beyond high school," but not licensure or "even an associate's degree." *Id.* at 417.  Thus, *White* does not speak to whether a position can be said to require "advanced knowledge … acquired by a prolonged course of specialized intellectual instruction" when a variety of different types of prolonged specialized study can qualify an individual for the job.

The case *sub judice* is very different.  It is undisputed that the Ohio Administrative Code, 5101:3-45-01(K), requires the licensure of case managers in either nursing or social work, and that Carestar imposes the same licensure requirement.  S*ee Job Description*, Doc. 29-6 ("Qualifications: Licensed Social Worker, Licensed Independent Social Worker or Registered Nurse").  Moreover, there is no question each such type of licensure requires its own prolonged course of specialized intellectual study:[10] Plaintiffs do not dispute that nursing and social work are "fields of science or learning."[11]

---

[10] As Plaintiffs correctly point out, many skilled jobs require a state license but do not require a prolonged course of specialized intellectual study. *See, e.g.,* 29 C.F.R. 541.301(e)(2) (stating licensed practical nurses are not learned professionals).

[11]       Plaintiffs do argue that, because Carestar's licensure requirement does not require at least a bachelor's degree, Carestar's case managers cannot not qualify for the "learned professional" exemption. (*See Carestar New Employee Information*, Doc. 29-9 (evincing that several Case Managers were hired with only Bachelor's degrees in Social Work, and one was hired with only an Associate's degree); *see also Case Manager Compensation Rubric*, Doc. 29-4 (explicitly contemplating hirees with only Associate's degrees)).

In support of this proposition, Plaintiffs cite a DOL opinion letter in which states that: "Work which can be performed by employees with education and training which is less than that required for a bachelor's degree would not be work of a bona fide professional level within the meaning of the regulations." Department of Labor Opinion Letter, 2001 WL 1558745 (January 24, 2001). As Defendants correctly point out, however, in the 2004 Preamble to the revised Section 541.301, the DOL explicitly changed its position regarding the significance of a four-year degree, and stated that employees can qualify for the learned professional exemption "if they either possess the

Case managers are not, however, working as nurses or as social workers in the traditional sense.[12]  The question, then, is the extent to which case managers' primary duties actually require the advanced knowledge acquired through nursing or social work training.  If Plaintiffs' primary duties require only general case management knowledge acquired through Carestar's in-house training sessions and on-the-job experience, then "case management" would constitute a "skilled trade where … the [required] knowledge is of a fairly advanced type,[13] but is not in a field of science or learning." 29 C.F.R. § 541.301(c).  In contrast, if Plaintiffs' primary duties require knowledge gained through their advanced courses of training in nursing or social work, this would satisfy the "primary duty" requirement of the "learned professional" exemption.  *See* 29 C.F.R. § 541.300(a)(2)(i).

Plaintiffs argue Carestar's Case Manager job description acknowledges that someone with no social work knowledge (such as a nurse) or someone with no nursing knowledge (such as a social worker) can do the job.  This oversimplifies: it is entirely plausible that nursing and social work instruction might have common elements, the knowledge of which is necessary to perform the work of a case manager.  Nor is it dispositive that Carestar's Case Manager job

---

requisite advanced degree or 'have substantially the same knowledge level *and perform substantially the same work* as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction.'" 69 Fed.Reg. 22150 (emphasis in original).

Moreover, there is binding Sixth Circuit precedent that adopts the latter position with respect to the significance of bachelor's degrees in the "learned professional" analysis. In *Rutlin v. Prime Succession, Inc.,* 220 F.3d 737 (6th Cir.2000), the Sixth Circuit held that a licensed funeral director was a learned professional despite the absence of a college degree requirement. "As a funeral director and embalmer, plaintiff had to become licensed by the state. In order to become licensed, plaintiff had to complete a year of mortuary science school and two years of college . . . ." *Id*. at 742. The court concluded that a funeral director was required to "complete a specialized course of instruction directly related to his primary duty of embalming human remains" and specifically stated that "[t]he FLSA regulations do not require that an exempt professional hold a bachelor's degree . . . ." *Rutlin*, 220 F.3d at 742. Accordingly, here, in light of Carestar's licensure requirement, the fact that a bachelor's degree is not requirement for Carestar's case managers does not resolve the question of whether Plaintiffs' primary duties qualify them as "learned professionals" under the FLSA regulations.

[12] Indeed, in their capacity as case managers, even registered nurses are prohibited from providing hands-on nursing care. (*See Gruber Dep*., Doc. 29, 116:11-15 ("Q. And do you know if CareStar case managers can provide nursing care even if they're licensed? A. No, absolutely not. No hands-on care at any time, any way, shape or form.")).

[13] Case management knowledge is not obtained at the high school level. *See* 29 C.F.R. § 541.301(b). ("Advanced knowledge cannot be attained at the high school level.").

description does not list any specific nursing or social work responsibilities.  The question is whether, in practice, a job's primary duties require an employee to utilize qualifying advanced knowledge, or particular skills learned through prolonged specialized intellectual instruction; the law does not require a job description to refer specifically to such knowledge or skills in order to satisfy the "primary duty" test.

At its core, the question of whether nursing or social work training is functionally required to perform a case manager's primary duties requires an intensely fact-based inquiry. *See* 29 C.F.R. § 541.700(a) ("Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."). A review of the record reviews a genuine dispute of material fact on this point.

Indeed, Defendants offer various affidavits highlighting the relevance of these professional licenses to Plaintiffs' case management work,[14] suggesting that – particularly with respect to consumers with complex diagnoses and multiple chronic conditions – case managers use critical thinking skills and medical and social work knowledge acquired during their professional training. (*Farrell Aff.*, Doc. 34-2, ¶ 15, 17.) Plaintiffs counter with evidence that Carestar's practice guidelines detail a course of action for every contingency, and that Carestar actively trains its case managers in how to use consumer assessment tools, coordinate services for consumers with different diagnoses and conditions, and address adverse incidents. (*See Case*

---

[14] The ODJFS Bureau Chief in charge of the Medicaid Waiver Program offered an Affidavit in support of Defendant's Motion for Summary Judgment stating,

> The primary reason the case managers are required to be registered nurses, licensed social workers, or licensed independent social workers is that the required case management functions involve intellectual work requiring discretion and judgment; thus, advanced specialized knowledge is needed.

(*Moscardino Aff.*, Doc. 34-1, ¶ 12.)

Carestar's Director of Clinical Services, who bears ultimate responsibility for the Case Managers, also submitted an affidavit in support of Defendants' Motion stating: "Without those professional licenses and specialized intellectual instructions required to gain and to hold such licenses, case managers would be unable to perform their duties." (*Farrell Aff.*, Doc. 34-2, ¶ 9.)

*Mgmt. Practice Guidelines*, Doc. 29-11; *All Service Plan ("ASP") Instructions*, Doc. 29-12; *Supp. Cook Aff.*, Doc. 35-5.)  This knowledge, combined with on-the-job experience, is – according Plaintiffs' affidavit evidence – far more relevant to the performance of case management duties than knowledge acquired through social work and/or nursing training. *Bowman Aff.*, Doc. 33-1; *Cook Aff.*, Doc. 33-2; *Gildow Aff.* Doc. 33-3; *Kurtz Aff.*, Doc. 33-4; *Potelicki Aff.*, Doc. 33-5; *Steele Aff.*, Doc. 33-6.

Defendants rejoin that case managers' essential knowledge of how to interview and make observations as part of the home care assessment process is derived through their prior professional training. (*Weed Aff.*, Doc. 34-6, ¶¶ 16 and 17.) Plaintiffs parry with evidence that Carestar does train its case managers in assessment and interviewing. (*See Supp. Cook Aff.*, Doc. 35-5, ¶ 2.)  Defendants argue that case managers – who are "mandated reporters" legally obligated to report abuse, neglect, and exploitation – learn how spot such situations as part of their licensure. (*Weed Aff.*, Doc. 34-6, ¶¶ 16 and 17.) Plaintiffs present contrary evidence that Carestar trains its case managers in their reporting duties. (*Supp. Cook Aff.*, Doc. 35-5, ¶¶ 3-7.) Likewise, although Carestar's President acknowledges a long list of case manager qualifications and responsibilities that would not be customarily obtained through a prolonged and specialized academic course of study,[15] the relative primacy of those qualifications and responsibilities is in dispute.

---

[15] These items include:
- 12 months experience in the home and community-based services environment within the past 5 years.
- Integrity, self-discipline, with the ability to work independently within specific case manager practice guidelines.
- Effective oral and written communication skills with attention to detail in assessment and in documentation.
- Effective interpersonal skills with respect for others including consumers, coworkers and other professionals within a diverse work environment.
- Ability to learn48 to conduct health and safety, social and environmental assessments.
- Knowledge of human behavior and family dynamics.

Based on the record outlined above, it is not appropriate for the Court to decide at this juncture whether Plaintiffs' primary duties as case managers require advanced nursing and social work knowledge. At the summary judgment stage, it is not the role of the trial court to resolve disputes by weighing the conflicting evidence – that is a job for the jury. *Kraus*, 915 F.2d at 230. Accordingly, even had Plaintiffs not established Defendants' failure to satisfy the "fee-basis" requirement, *see* § III.A.1., supra, this genuine dispute of material fact as to Plaintiffs' primary duties would preclude the grant of summary judgment for Defendants.

Based on the foregoing, the Court finds that Plaintiffs' are not exempt "learned professionals" under the FLSA, as a matter of law.  Thus, with respect to "learned professional" exemption, Plaintiffs' Motion for Summary Judgment is **GRANTED**, and Defendant's Motion is **DENIED**.

---

- Ability to effectively prioritize multiple tasks to accomplish work in compliance with CareStar identified priorities and standards.
- Demonstrates strong critical thinking, problem solving skills and flexibility in relationship to job requirements.
- Computer skills sufficient to enter consumer information electronically and use.
- CareStars website and email, i.e., famil[i]arity with Microsoft Office programs.
- Understand and comply with CareStar Policies and Procedures.
- Maintains knowledge of Medicare, third party payers and community resources.
- Maintains knowledge of the Americans with Disabilities Act. Informs designated CareStar personnel of new or revised community resource and/or provider information for incorporating into CareStar database, including but not limited to housing, nutrition, mental health, social service and medical and dental services.
- Maintains knowledge of the Ohio Home Care Rules and Medicaid State Plan.
- Periodically re-determines the consumers' eligibility in compliance with applicable standards for content and timeliness.
- Documents all consumer and case-related contacts and interventions in the consumer's communication notes per agency policy, including standards of content and timeliness. Completes disenrollment, Temporary Nursing Home Stays and other forms according to established timeframes and according to established processes.
- Ensures consumers receive education concerning their rights and responsibilities, and when applicable, are provided notice of due process Hearing Rights. Assists supervisor in preparation for hearings as requested.
- Attends orientation, trainings, in-services, consumer care conferences, and staff meetings as determined by Supervisors.

Gruber Dep., Ex. 11A.

### B. Whether President Gruber is Liable as an "Employer"

In addition to proceeding against Carestar, Plaintiffs have named Carestar's President, Guber, as a co-defendant, on the theory that he too is an "employer" under the FLSA. The FLSA, 29 U.S.C. § 203(d), defines an "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." *See Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965 (6th Cir. 1991). More than one "employer" can be simultaneously responsible for FLSA obligations.  *Id.* "The remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications."  *Id.* (quoting *McLaughlin v. Seafood, Inc.,* 867 F.2d 875, 877 (5th Cir. 1989) (per curiam)). The question of "[w]hether a party is an employer within the meaning of the FLSA is a legal determination." *Id.* (citing *Patel v. Wargo,* 803 F.2d 632, 634 (11th Cir. 1986); *Karr v. Strong Detective Agency, Inc.,* 787 F.2d 1205, 1206 (7th Cir. 1986); *Donovan v. Brandel,* 736 F.2d 1114, 1116 (6th Cir. 1984)).

The Sixth Circuit has held that "the test to be applied in determining whether a person is an 'employer' responsible for FLSA obligations is one of 'economic reality,'"  rather than "common law concepts of agency." *U.S. Department of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775, 778 (6th Cir. 1995) (quoting *Fegley v. Higgins,* 19 F.3d 1126, 1131 (6th Cir. 1994), *cert. denied,* 513 U.S. 875); *Dole,* 942 F.2d at 965. Under this "economic reality" test, "a corporate officer who has operational control of the corporation's covered enterprise is an 'employer' under FLSA, along with the corporation itself." *Cole,* 62 F.3d at 778 (citing *Fegley,* 19 F.3d at 1131). More specifically, "[o]ne who is the chief executive officer of a corporation, has a significant ownership interest in it, controls significant functions of the business, and determines salaries and makes hiring decisions has operational control and qualifies as an 'employer' for the

purposes of FLSA. *Id.*; *see also Dole*, 942 F.2d at 965 ("corporate officers with a significant ownership interest who had operational control of significant aspects of the corporation's day to day functions, including compensation of employees, and who personally made decisions to continue operations despite financial adversity during the period of non-payment" were employers under the FLSA).  In determining whether a party is an employer, "[n]o one factor is dispositive; rather, it is incumbent upon the courts to transcend traditional concepts of the employer-employee relationship and assess the economic realities presented by the facts of each case." *Dole*, 942 F.2d at 965 (quoting *Donovan v. Sabine Irrigation Co.,* 695 F.2d 190, 195 (5th Cir.), *cert. denied,* 463 U.S. 1207 (1983)).

Here, Gruber is Carestar's chief corporate officer (President), and owns 11% of Carestar's shares.  (*Gruber Dep*., Doc. 29, 9:9-13.) In addition, Gruber owns shares of Carestar stock through its Employee Stock Ownership Plan, which owns the remaining 89% of Carestar. (*Id*. at 10:1-22). Although this in itself is not dispositive, *see Cole*, 62 F.3d at 778 (corporate officer held personally liable owned 50% interest in the corporation), the evidence indicates that Gruber exerted operational control over the company and its day-to-day functions. As Gruber testified at his deposition, he "has overall authority and responsibility to direct the activities of the organization," (*id*. at 14:18-15:4), and all of his subordinates represent his authority in their areas of responsibility. (*Id*. at 15:5-20.) Furthermore, no one at Carestar "has more influence than [Gruber] in setting compensation levels for jobs," (*id*. at 29:10-15). Similarly, Gruber testified that no one at Carestar "has more control over CareStar's financial affairs" than himself. (*Id*. at. 29:20-30:18.) Finally, he testified that, "[wh]en it comes to establishing CareStar's budgets and financial targets," no one "has more control than [Gruber]."(*Id*. at 33:13-18). Although, Gruber testified is not specifically involved in the hiring of the Case Managers or their supervisors, the

overall "economic reality" of Carestar is such that Gruber is legally an "employer" responsible for Carestar's FLSA obligations.  *Dole*, 942 F.2d at 965 ("Whether a party is an employer within the meaning of the FLSA is a legal determination.").

In light of the above, Plaintiff's Motion for Summary Judgment is **GRANTED** with respect to Grubers' liability for the misclassification of Carestar's case managers.

### *C. Damages*

#### 1. Calculation of Overtime Compensation

Because Plaintiffs were misclassified as exempt employees, they are entitled to overtime compensation in accordance with 29 U.S.C. 207(a) and the DOL's overtime regulations at 29 C.F.R. Part 778. According to FLSA regulations, Plaintiffs' overtime compensation should be calculated as follows:

> [The FLSA] requires the payment of overtime compensation for hours worked in excess of the applicable maximum hours standard at a rate not less than one and one-half times the regular rate. The overtime rate, like the regular rate, is a rate per hour. *Where employees are paid on some basis other than an hourly rate*, the regular rate is derived, as previously explained, by dividing the total compensation (except statutory exclusions) by the total hours of work for which the payment is made.

29 C.F.R. § 778.308 (emphasis added). [16]

Here, it is undisputed that Plaintiffs "are paid on some basis other than an hourly rate," namely Carestar's points-based compensation system. Thus, in determining the "regular rate," the Court divides the total compensation in any given pay period "by the total hours of work for which the payment is made," consistent with the language of 29 C.F.R. § 778.308. Plaintiffs urge this Court to interpret the term "total hours of work for which the payment is made" to mean the

---

[16] Defendants also argue that Plaintiffs overtime compensation should be calculated pursuant to the "pieceworker" overtime standard set forth in 29 C.F.R. 778.111.  As this Court explained above, however, Case Managers' work is not divisible into "single jobs" such as those done by a piece worker.  *See* 29 C.F.R. § 541.605(a). Accordingly, the pieceworker overtime compensation standard does not apply.

hours Plaintiffs knew they were scheduled to work. Defendants, however, citing 29 C.F.R. § 778.109, argue that that divisor for the purposes of determining the "regular rate" can only mean "the total number of hours *actually* worked by [the employee] in that workweek for which such compensation was paid."[17] (Emphasis added).

The relevant case law supports Plaintiffs' interpretation that "total hours of work for which the payment is made" can mean the hours that Plaintiffs knew they were scheduled to work. Thus, in *Fegley v. Higgins*, 19 F.3d 1126, 1129-30 (6th Cir. 1994), the Sixth Circuit held that the divisor for the purposes of determining the "regular rate" was the regular work schedule of which the employee was aware and had agreed: 56 hours per week. *See also Brennan v. Valley Towing Co*., 515 F.2d 100, 106 (9th Cir. 1975) (holding that the divisor was the number of hours in the "scheduled workweek"); *Mumbower v. Callicott*, 526 F.2d 1183, 1187 (8th Cir. 1975) ("[A]bsent explicit proof of a mutual agreement for a rate of pay capable of delineation in hourly terms, the court must infer that the 'regular rate' is substantially that calculated by dividing the total weekly compensation by the number of hours scheduled in the workweek.").

Plaintiffs have provided evidence that there was no general agreement or clear general communication putting Case Managers on notice that compensation did not correspond to a 40 hour work week. Plaintiffs therefore argue that, in the absence of any such agreement or understanding between Carestar and its Case Managers, the divisor for the purposes of determining the "regular rate" should be 40. *See Brantley v. Inspectorate Am. Corp*., 821 F.

---

[17] This is a reference to, 29 C.F.R. § 778.109, which states in full:
> The "regular rate" under the Act is a rate per hour. The Act does not require employers to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission, or other basis, but in such case the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom and, therefore, it is necessary to compute the regular hourly rate of such employees during each workweek, with certain statutory exceptions discussed in §§ 778.400 through 778.421. The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid.

Supp. 2d 879, 894 (S.D. Tex. 2011) (divisor not 40 because Plaintiffs "on notice that their non-overtime compensation did not correspond to a 40 hour work week").  Nevertheless, the Court finds that there is a dispute of material fact as to the number of hours per week Plaintiffs were aware they would be working. *See Fegley*, 19 F.3d at 1129-30 (divisor is the number of hours per week plaintiff was aware he would be working). This number, to be determined by a factfinder, will serve as the divisor for the purposes of determining the Plaintiffs' "regular rate."  Plaintiff's overtime compensation for hours worked in access of forty hours per week is one and one-half times that regular rate. 29 C.F.R. § 778.308.

Based on the above, Plaintiffs' Motion for Summary Judgment is **DENIED** with respect to the calculation of overtime compensation.

<u>2. Whether Plaintiffs are Entitled to Liquidated Damages</u>

The FLSA provides for liquidated damages in an amount equal to the Plaintiffs' actual damages. 29 U.S.C. § 216(b). Under the Portal-to-Portal Act, however, the court may, in its discretion, determine that an award of liquidated damages is improper under certain circumstances:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages....

29 U.S.C. § 260. Under this provision, "an employer must demonstrate that its conduct was both in good faith and reasonable for the court to determine that liquidated damages are improper." *Viciedo v. New Horizons Computer Learning Ctr. of Columbus, Ltd.*, 246 F. Supp. 2d 886, 906 (S.D. Ohio 2003).  Federal courts "have determined that an employer acts in good faith so as to

justify denying liquidated damages when the employer relies on representations or decisions of the DOL [Department of Labor] that the employer's conduct does not violate the FLSA." *Id.*

Here, Defendants assert that they solicited and relied in good faith on Katz's opinion letter regarding case manager classification. Although such an attorney letter is not a "representations or decisions of the DOL," this does not preclude Defendants from asserting a "good faith" defense as a matter of law. *See Featsent v. City of Youngstown*, 70 F.3d 900 (6th Cir. 1995) (seeking advice of counsel and following that advice may result in a denial of liquidated damages); *Martin v. Indiana & Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004) (good faith and reasonable grounds could be established by the employer by taking affirmative steps to ascertain the Act's requirements).

Nevertheless, Plaintiffs have presented evidence that Defendants solicited Katz's legal opinion from Katz based only on Gruber's oral representations of the roles, responsibilities and compensation of case managers.  It is undisputed that Katz reviewed no documents and spoke to no other Carestar representatives other than Gruber in preparing his opinion, and Gruber was fully aware that this was the case. Moreover, Plaintiffs have presented evidence that Gruber himself concedes that he has no personal knowledge of case managers' actual job duties. Construing the facts in the light most favorable to the non-moving party, a reasonable jury could find that Defendants' purported "grounds for believing that [their] act or omission was not a violation of the FLSA" were not, in fact, reasonable. Accordingly, there remains a dispute of material fact that precludes summary judgment for either party on the question of whether Plaintiffs are entitled to liquidated damages.[18]

---

[18] Plaintiffs also argue that CareStar's failure to perform the audit noted in counsel's Opinion Letter negates the good faith requirement of 29 U.S.C §260. The audit appears to be an attempt to ensure compliance with 29 C.F.R. 541.605, wherein compensation does not qualify as payment on a "fee basis" if the alleged professional does not earn the minimum amount of $455 per week. The regulation, 29 C.F.R. 541.605(b), requires an employer claiming

Therefore, with respect to the award of liquidated damages, Plaintiffs' Motions for Summary Judgment is **DENIED** and Defendants' Motion is likewise **DENIED.**

### D. Statutory Period: Whether Carestar's Violation Was Willful

Generally, FLSA claims are governed by a two-year statute of limitations. *See* 29 U.S.C. § 255(a).[19] Such claims may be governed by a three-year statute of limitations, however, where the statutory violation was "willful." *Claeys vs. Gandalf, Ltd.*, 303 F. Supp. 2d 890, 893 (S.D. Ohio 2004) (citing 29 U.S.C. § 255(a)).[20] Here, Plaintiffs have alleged that Defendants "willfully" misclassified case managers as exempt employees and that, therefore, Plaintiffs are entitled to recover back wages for a three year period.  Plaintiffs do not move for summary judgment on the question of whether Carestar's misclassification of case managers as exempt was a willful violation of the FLSA.  Defendants' Motion asks this Court to find that, on the facts of this case, Defendants' violation was not "willful" as a matter of law; Plaintiffs assert that there remain disputed matters of material fact precluding summary judgment.

Under federal law, "to establish willfulness, the plaintiff must demonstrate that the employer either knew or showed reckless disregard for whether its conduct violated the FLSA." *Claeys*, 303 F. Supp. 2d at 893 (citing *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133

---

to have a valid fee basis of payment to "test" whether in fact the employee would earn $455 per week if he or she in fact had worked 40 hours. Because Plaintiffs in this case all earned above the required minimum, the audit requirement is not relevant to the violations of law at issue in this case.

[19] The statutory provision setting forth the statute of limitations states, in relevant part:

> Any action ... to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938 ... may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued[.]

29 U.S.C. § 255(a).

[20] Under the Ohio Revised Code, recovery for overtime violations is limited to two years, and there is no provision for an extension in the case of a willful violation by an employer. *See* O.R.C. 2305.11(A), *Claeys*, 303 F. Supp. 2d at 893.

(1988); *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111 (1985)). For example, the Sixth

Circuit has found that an employer's violation was willful where the employer "'had actual

notice of the requirements of the FLSA by virtue of earlier violations, his agreement to pay

unpaid overtime wages, and his assurance of future compliance with the FLSA.'" *Herman v.

Palo Group Foster Home, Inc.,* 183 F.3d 468, 474 (6th Cir.1999) (quoting *Dole v. Elliott Travel

& Tours, Inc.,* 942 F.2d 962, 967 (6th Cir.1991)). Similarly, "[c]ases under the ADEA and FLSA

have found willfulness most frequently in situations in which the employer deliberately chose to

avoid researching the laws' terms or affirmatively evading them." *Hoffman vs. Professional Med

Team*, 394 F. 3d 414, 419-20 (6th Cir. 2005). "A willful violation requires that the employer

acted recklessly, at least; it is not sufficient that the employer acted unreasonably. *Claeys*, 303 F.

Supp. 2d at 893 (citing *McLaughlin,* 486 U.S. at 135 n.13). Moreover, as the Sixth Circuit has

noted, the Supreme Court has affirmed a finding of no willfulness under this standard where an

employer made a good faith attempt to formulate a policy compliant with the law. *Hoffman*, 394

F. 3d at 420 (citing *Trans World Airlines, Inc. vs. Thurston*, 469 U.S. 111, 129 (1985)). Plaintiffs

bear the burden to prove that a violation was "willful." *Richmond Shoe*, 486 U.S. at 135.

 Here, there is no evidence that Defendants had actual notice that Carestar had

misclassified its Case Managers in violation of the FLSA.  On the facts of this case, however, a

reasonable jury could conclude that Defendants acted recklessly.  Certainly, solicitation of a

legal opinion can demonstrate a good faith effort to formulate a policy that complies with the

law. *See Pignataro vs. Port Authority of New York & New Jersey*, 593 F. 3d 265, 273 (3rd Cir.

2010) (employer's reliance upon advice from its law department found not to be reckless

disregard but instead demonstrated reasonableness and good faith effort to comply with the law);

see *Howard vs. Port Authority of New York & New Jersey*, 684 F. Supp. 2d 409, 415 (S.D.N.Y.

2010) (acting on advice of counsel in determining FLSA compliance was not unreasonable or reckless); *Quirk vs. Baltimore County, Md.*, 895 F. Supp. 773, 788-789 (D. Maryland 1995) (employer's consultation with legal counsel concerning the applicability of the exemption demonstrated good faith and reasonable grounds for believing it was not in violation of the FLSA). Here, Defendants present evidence they solicited and relied on Katz's opinion letter regarding Case Manager classification in good faith. As described above, however, Katz's opinion letter was based only on Gruber's oral representations of the roles, responsibilities and compensation of Case Managers. Moreover, it is undisputed that Katz was not asked to, and did not, review any documents or speak to any Carestar representatives beyond Gruber in preparing his opinion. Moreover, Gruber himself concedes that he has no personal knowledge of case managers' actual job duties. Construing the facts in the light most favorable to the non-moving party, a reasonable jury could find that such conduct was reckless. Accordingly, there remains a disputed matter of material fact that precludes summary judgment on the question of whether Defendants' violation was "willfull" under the meaning of the FLSA.

Defendant's Motion for Summary Judgment as to the question of "willfulness" is therefore **DENIED**.

### IV. CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment is **DENIED** in its entirety. Plaintiff's Motion for Partial Summary Judgment is **GRANTED** as to Plaintiffs' non-exempt status and Gruber's liability and **DENIED** in all other respects.

**IT IS SO ORDERED.**

**s/ Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Judge**

**Dated: September 16, 2013**